**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**


Gary F. Joyal

     v.                         Civil No. 16-cv-230-AJ
                                       Opinion No. 2017 DNH 130

Aminda Daviduk


## MEMORANDUM AND ORDER

The plaintiff, Gary Joyal, brings this action seeking the enforcement of four promissory notes executed by the defendant, Aminda Daviduk, in 2010 and 2011. Doc. no. 1. Daviduk brings counterclaims against Joyal for fraud and negligent misrepresentation. Doc. no. 6. Joyal moves for summary judgment (doc. no. 15), and Daviduk objects (doc. no. 19). The court held a hearing on June 12, 2017. For the reasons that follow, Joyal's motion is granted as to Daviduk's counterclaims and granted in part and denied in part as to his own claim.


## Summary Judgment Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Xiaoyan Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). "An issue is 'genuine' if it can be resolved in favor of

either party, and a fact is 'material' if it has the potential of affecting the outcome of the case." Xiaoyan Tang, 821 F.3d at 215 (internal quotation marks and citations omitted). At the summary judgment stage, the court "view[s] the facts in the light most favorable to the non-moving party" and "draw[s] all reasonable inferences in the nonmovant's favor . . . ." Garmon v. Nat'l R.R. Passenger Corp., 844 F.3d 307, 312 (1st Cir. 2016) (citation and quotation marks omitted). The court will not, however, credit "conclusory allegations, improbable inferences, and unsupported speculation." Fanning v. Fed. Trade Comm'n, 821 F.3d 164, 170 (1st Cir. 2016) (citation and quotation marks omitted) cert. denied, 137 S. Ct. 627 (2017).

"A party moving for summary judgment must identify for the district court the portions of the record that show the absence of any genuine issue of material fact." Flovac, Inc. v. Airvac, Inc., 817 F.3d 849, 853 (1st Cir. 2016). Once the moving party makes the required showing, "'the burden shifts to the nonmoving party, who must, with respect to each issue on which [it] would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in [its] favor.'" Id. (citation omitted). "This demonstration must be accomplished by reference to materials of evidentiary quality, and that evidence must be more than 'merely colorable.'" Id. (citations omitted). The nonmoving party's failure to make the requisite showing

"entitles the moving party to summary judgment."  Id.

## Background

The relevant facts, when viewed in the light most favorable to Daviduk, are as follows.

Between November 2010 and March 2011, Daviduk executed four promissory notes payable to Joyal.  The first two notes were executed on November 12 and November 30, 2010, and totaled $40,886.20 ("November 2010 notes").  See doc. no. 15-2; doc. no. 15-3.  The remaining two notes were executed on March 15 and March 17, 2011, and totaled $40,000.00 ("March 2011 notes").  See doc. no. 15-4; doc. no. 15-5.

Other than the amounts, the notes were identical and contained, in relevant part, the following terms:

> . . . [The] principal and interest shall be paid on demand.
> Notwithstanding the forgoing, Maker is required to repay in
> full the entire outstanding Loan Balance upon the earlier
> of either thirty (30) days, or upon restructure of the
> debt.
> . . .
>
> Maker further agrees to pay all costs of collection,
> including a reasonable attorney's fee, including attorney's
> fees in event of appeal, in case the principal of this Note
> or any interest thereon is not paid on demand.
> . . .
>
> This Note may not be changed orally, but only by agreement
> in writing, signed by the party against whom enforcement of
> any waiver, charge, modification or discharge is sought.

See, e.g., Doc. no. 15-2.[1]  The notes also contained two provisions concerning interest, the first stating that outstanding principal would be subject to an interest rate of ten percent compounded annually, and the second stating that the note would bear an annual interest rate of ten percent commencing five business days after Daviduk received notice of a demand of payment.  Id.  The notes stated that they were to be "construed and enforced according to the laws of the State of Massachusetts."  Id.

All four notes were executed contemporaneously with the negotiation and execution of several other, related transactions involving Joyal and Daviduk.  In mid-to-late 2010, Daviduk was in the process of divorcing her husband.  See doc. no. 15-11 at 2.  Daviduk and her husband jointly owned five Dunkin' Donuts franchises.  Affidavit of Aminda Daviduk (doc. no. 19-2) ¶ 2.  Daviduk agreed to purchase her husband's share of all five franchises in exchange for a fifteen year annuity, payable to her husband in the amount of $78,000.00 per year in gross annual income.  Doc. no. 15-13 at 1, 2.  It is plain from the record that Joyal, through his company Joyal Capital Management ("JCM"), was involved in that transaction, though the specific

---

[1] To the extent the contract language is the same across all four promissory notes, the court will only cite to one of the notes.

nature of his involvement is unclear.  See doc. no. 15-11; doc. no. 15-12.

In order to fund the annuity, Joyal suggested that Daviduk sell one of the five Dunkin' Donuts franchises.  Daviduk Aff. ¶ 1, 5.  Joyal stated that the sale proceeds would cover the annuity and leave Daviduk approximately $100,000.00 that she could put toward overhead for the remaining four franchises. Id. ¶ 5.  On January 14, 2011, Daviduk entered into a purchase and sale agreement to sell one of the franchises for $1,240,000.00.  Doc. no. 15-14 at 1, 3.  Joyal "organized and orchestrated" this sale.  Daviduk Aff. ¶ 8.

The sale of the franchise closed on March 15, 2011.  Doc. no. 15-9.  On that date, Daviduk discovered that she would not receive any net proceeds from the sale, and would in fact have to pay approximately $10,000.00.  Daviduk Aff. ¶ 10.  She further learned that Joyal would receive a considerable amount in disbursements and commissions as part of the transaction. Id. ¶ 11.  Daviduk threatened to walk away from the closing, but Joyal and his associates assured her that the transaction "would all work out" and promised that they would "take care of any shortfalls."  Id. ¶ 12.

As of the date of the closing, Daviduk and Joyal had already executed the November 2010 notes.  See doc. no. 15-2; doc. no. 15-3.  Joyal promised at the closing that proceeds

received from the sale of the franchise would pay off the November 2010 notes. Daviduck Aff. ¶ 13. The March 2011 notes were executed on the day of the closing, see doc. no. 15-4, and two days later, see doc. no. 15-5. Joyal assured Daviduk at the time those notes were executed that they were only being presented as promissory notes for tax purposes, that they were intended to "help make things right," and that he would only need a "payment or two" to satisfy any tax concerns. Id.

Following the closing, Joyal, through JCM, secured Daviduk's husband an annuity through the Guardian Insurance & Annuity Company, Inc. ("Guardian"), see doc. no. 15-16, and a life insurance policy through Allianz Life Insurance Company of North America ("Allianz"), see doc. no. 15-17. Joyal attached a copy of the application for the Guardian annuity to his motion for summary judgment. See doc. no. 15-15. At the end of this attachment is a single-page document captioned "Aminda Daviduk; Northern Loan Request; Sources/Uses of Funds; Dec-10" (hereinafter the "Dec-10 document"). Id. at 13 (formatting altered; semicolons indicate new line in original). The top of this document reads "keep 4 stores, sell 1 location," and appears to contemplate a $2,200,000.00 loan. Id. The document includes several line items seemingly related to how that loan money would be used. Id. One of the line items is for "JCM-funds owed regarding Morgan Stanley payments made on Minda's

6

behalf" with an amount entry of "(41,000)." Id. A separate entry reads "Net Cash from 2 store sale to Cafua" with an amount entry of "$1,200,000." Id. Though the Dec-10 document was apparently in Joyal's possession, neither party can explain its provenance.

Daviduk made four payments toward the promissory notes: $2,000 in April 2011, $1,500 in July 2014, $2,500 in August 2014, and $1,000 in September 2014. See doc. no. 15-6. All four payments were applied toward the November 12, 2010 note. See id. Between October 3, 2014, and September 8, 2015, Becky Green, a controller at JCM, reached out to Daviduk repeatedly in an attempt to coordinate additional payments toward the notes. See doc. no. 15-10. On April 27, 2016, Joyal, through his present counsel, sent Daviduk a demand letter for the outstanding balances on the notes, plus interest. See doc. no. 15-7. Joyal filed this action on June 3, 2016. See doc. no. 1.

## Discussion

Joyal seeks to enforce the promissory notes, alleging he is entitled to the outstanding principal and interest under the notes, plus statutory post-judgment interest and the costs of collection, including attorney's fees. Daviduk counterclaims, alleging that the notes are unenforceable due to negligent misrepresentations and fraud on the part of Joyal. Joyal moves

for summary judgment on both his own claim and Daviduk's counterclaims.

## I.   Daviduk's Counterclaims

The court turns first to Daviduk's counterclaims.  Joyal argues, among other things, that these claims are barred by New Hampshire's three-year statute of limitations.  See N.H. Rev. Stat. Ann. ("RSA") § 508:4, I.

"Pursuant to RSA 508:4, 'all personal actions, except actions for slander or libel, may be brought only within 3 years of the act or omission complained of' unless the discovery rule exception applies." Perez v. Pike Industries, Inc., 153 N.H. 158, 160 (2005) (quoting RSA 508:4, I).  "[O]nce the defendant establishes that the cause of action was not brought within three years of the alleged act, the burden shifts to the plaintiff to raise and prove the applicability of the discovery rule exception." Id. at 160.

As Joyal notes in his motion, all alleged acts underlying Daviduk's counterclaims occurred during the spring of 2011, well more than three years prior to the date on which the counterclaims were alleged.  The burden therefore shifts to Daviduk to demonstrate that the discovery rule tolled the limitations period such that these claims are timely.  She has not done so here.  Daviduk does not address the limitations period, let alone the discovery rule, at all in her objection.

8

At the hearing, her counsel conceded that her counterclaims were likely susceptible to dismissal on limitations grounds and did not argue that the discovery rule applied.[2] Daviduk has therefore failed to sustain her burden, and her counterclaims are time-barred.

Joyal's motion for summary judgment is accordingly granted as to Daviduk's counterclaims.

## II. __Joyal's Action__

Though he spends much of his motion anticipating and addressing Daviduk's potential defenses, Joyal's central argument in favor of summary judgment is that the promissory notes are enforceable by their plain terms. This argument satisfies Joyal's initial burden. There is no dispute that Daviduk did not repay the notes when Joyal demanded that she do so. There similarly does not appear to be a dispute that the notes were never modified in writing. Limited to these facts, Joyal would be entitled to recover the outstanding principal and interest, as well as the costs of collection, under the plain terms of the notes. Thus, the burden shifts to Daviduk to point

---

[2] Daviduk's counsel stated at the hearing that he included the counterclaims in order to preserve fraud and negligent misrepresentation as defenses to Joyal's enforcement action. Though not included as an affirmative defense, the court concludes that Daviduk may nonetheless raise fraud as a defense to the enforcement of the March 2010 notes, as discussed in greater detail below. See infra pp. 13–14.

to evidence in the record from which a trier of fact could reasonably conclude that her failure to pay was nevertheless excusable.

Daviduk argues that she was not obligated to pay under the promissory notes because the notes themselves are not enforceable. She raises two arguments to this effect, one as to the November 2010 notes and another as to the March 2011 notes.[3] The court considers each argument in turn.

A. November 2010 Notes

Daviduk contends that there is evidence in the record suggesting that the November 2010 notes were satisfied by proceeds from the March 15, 2011 sale of the Dunkin' Donuts franchise. She makes two arguments to this end, one general and one specific. Neither is persuasive.

Generally, Daviduk argues that it is reasonable to conclude that the November 2010 notes were satisfied based solely on the amount Joyal and/or JCM purportedly received as part of the sale of the Dunkin' Donuts franchise. Daviduk has not, however, provided any evidentiary support for this conclusion. Instead, she asks the court to infer, purely from the amount Joyal

_____

[3] In her objection, Daviduk raises a third argument related to the interest rate provisions in the promissory notes. As this argument goes to damages rather than liability, the court addresses it in section III below.

10

received as part of the transaction (according to Daviduk, at least $272,884.00), that some of this money *must* have been used to satisfy the November 2010 notes. This argument is unavailing, as it is based upon pure speculation, and speculation alone is not enough to defeat summary judgment. See Fanning, 821 F. 3d at 170.

Daviduk also contends that the Dec-10 document indicates that the November 2010 notes were satisfied. She specifically points to the line item for "JCM-funds owed regarding Morgan Stanley payments made on Minda's behalf" in the amount of "(41,000)." See doc. no. 15-15 at 13. Daviduk contends that this line item corresponds with the $40,668.20 owed under the November 2010 notes. In Daviduk's view, the existence of a document with that line item in the record creates a triable issue of fact as to whether the November 2010 notes were satisfied.

The court is unpersuaded by this argument. Daviduk has identified no evidentiary basis to conclude that the Dec-10 document in any way reflects the actual state of affairs in this case. Indeed, the Dec-10 document contains several entries that are either unsupported anywhere in the record or directly refuted by the undisputed facts. For instance, there is no indication in the record that Daviduk ever actually pursued, let alone secured, a $2,200,000.00 loan. Yet this loan amount is

referenced in the Dec-10 document and appears directly related to the amounts of the line items in the document, including the line item relied upon by Daviduk.  Additionally, while the Dec-10 document contemplates a "2 store sale to Cafua," id., it is undisputed that Daviduk only sold one of the five Dunkin' Donuts franchises.  In light of these facts, the court concludes that the Dec-10 document reflects, at most, a hypothetical transaction that did not come to pass.  As such, no trier of fact could reasonably conclude, solely from its existence in the record, that the November 2010 notes were actually paid off.[4]

In sum, neither of Daviduk's arguments persuades the court that the November 2010 notes were satisfied.  Joyal's motion for summary judgment is accordingly granted as to Daviduk's liability under the November 2010 notes.

B.    March 2011 Notes

Daviduk argues that the March 2011 notes are unenforceable because they were the product of fraud on the part of Joyal.

---

[4] In her affidavit, Daviduk asserts that Joyal promised at the March 15, 2011 closing that any proceeds he received from that transaction would satisfy the November 2010 notes.  Daviduk Aff. ¶ 13.  Though she reiterates this assertion in the fact section of her memorandum in opposition to summary judgment, see doc. no. 19-1 at 4, she does rely upon it as a basis for avoiding summary judgment on the November 2010 notes.  This is perhaps unsurprising, given that each of the notes contained express language stating that they could not be changed orally, see, e.g., doc. no. 15-2, and there is nothing in the record to suggest that this purported promise was ever memorialized in writing.

She specifically contends that Joyal assured her at the time the notes were executed that they were only being presented as promissory notes for tax purposes, that they were intended to "help make things right," and that Joyal would only need a "payment or two" to satisfy any tax concerns.  Joyal disputes that he ever made such statements, but argues that even if he did it was unreasonable as a matter of law for Daviduk to rely on them because the statements were inconsistent with the express terms of the March 2011 notes themselves.

Before reaching the merits of these arguments, the court must address a preliminary issue: whether Daviduk may rely on a fraud defense now when fraud was solely alleged in her answer as a counterclaim, and not as an affirmative defense.  "As a general matter, unpleaded affirmative defenses are deemed waived."  Shervin v. Partners Healthcare Sys., Inc., 804 F.3d 23, 52 (1st Cir. 2015) (citation omitted).  A court may, however, "relax the raise-or-waive rule when equity so dictates and there is no unfair prejudice to any opposing party."  Id. (citation omitted).

Here, equity dictates that Daviduk be allowed to proceed with her fraud defense.  Daviduk raised fraud as a counterclaim in the same pleading in which she could have included it as an affirmative defense.  There was accordingly no delay in informing Joyal of the factual predicate for this defense.

Additionally, Joyal anticipated this defense and addressed it head on in his motion for summary judgment, suggesting that he does not object to the manner in which it was raised. There therefore does not appear to be any prejudice to Joyal in allowing Daviduk to raise this defense now. As such, the court will address Daviduk's fraud defense on its merits.

The parties' arguments with respect to the fraud defense lie at the intersection of two well-established precepts of Massachusetts law. On the one hand, "[s]tatements of present intention as to future conduct may be the basis for a fraud action, if the statements misrepresent the actual intention of the speaker and were relied upon by the recipient to his damage." Starr v. Fordham, 187, 648 N.E.2d 1261, 1267 (Mass. 1995) (citations and internal quotation marks omitted). Yet courts have repeatedly stated that "[i]t is unreasonable as a matter of law to rely on prior oral representations that are (as a matter of fact) specifically contradicted by the terms of a written contract." Masingill v. EMC Corp., 870 N.E.2d 81, 89 (Mass. 2007).

As relevant here, there are two leading cases that examine this issue: Turner v. Johnson & Johnson, 809 F.2d 90 (1st Cir. 1986) and McEvoy Travel Bureau, Inc. v. Norton Company, 563 N.E.2d 188 (Mass. 1990). As the facts of these cases inform the present analysis, the court briefly summarizes each.

In Turner, the plaintiffs sold their electronic thermometer business to the defendant in exchange for, among other things, royalties based on future sales of the plaintiffs' thermometers. 809 F.2d at 93. The final contract between the parties stated that the defendant was under no obligation to market the thermometers. Id. When the defendant ceased doing so after the sale, the plaintiffs sued, alleging that the defendant fraudulently stated during the course of negotiations that it would market the thermometers. Id. at 94.

The First Circuit concluded that the plaintiffs' fraud argument failed as a matter of law. Id. at 97. The court held that "where both parties were experienced in business and the contract was fully negotiated and voluntarily signed, plaintiffs may not raise as fraudulent any prior oral assertion inconsistent with the contract provision that specifically addressed the particular point at issue." Id. at 97. In reaching this conclusion, the court noted that "if a jury is allowed to ignore contract provisions directly at odds with oral representations allegedly made during negotiations, the language of a contract simply would not matter anymore." Id. at 96. Thus, the court stated, "a knowledgeable buyer should not sign a contract that conflicts with his or her understanding of the agreement." Id. at 97–98. The Massachusetts Supreme Judicial Court ("SJC") has reaffirmed this holding. See, e.g., Starr,

648 N.E.2d at 1268.

In McEvoy, the plaintiff was a small travel agency which had for decades provided air travel services to the defendant, a large Worcester-based conglomerate. McEvoy, 563 N.E.2d at 191. In 1980, the parties negotiated and orally entered into a "long-term" agreement in which the plaintiff agreed to make considerable logistical upgrades in exchange for increased business from the defendant. Id. After the plaintiff had started performing under the agreement, the defendant forwarded the plaintiff a written contract. Id. To the plaintiff's surprise, this contract included a sixty-day termination clause and contemplated a one-year, renewable term. Id. The plaintiff expressed concerns about these terms to the defendant, but ultimately executed the contract based on the defendant's assurances that the agreement would continue to be a long-term arrangement and that the termination clause was "inoperative" and "meaningless." Id. at 191–92. Three years later, the defendant entered into an arrangement with a different travel agency and invoked the termination clause. Id. at 192.

The plaintiff sued, alleging, inter alia, that the defendant fraudulently induced it to enter into the agreement. Id. Relying on Turner, the defendant argued that the alleged misrepresentations "contradict a specific and unambiguous provision in the contract" — namely, the termination clause.

16

Id. The SJC sided with the plaintiff, concluding that Turner was distinguishable in at least two respects. Id. at 193. First, the SJC noted that unlike in Turner, "the misrepresentations were not part of the negotiations but were made immediately prior to the signing of the initial contract." Id. To this end, the SJC noted that in Turner there was no allegation that the defendant, "in order to induce the plaintiffs to sign, pointed to a particular provision of the final contract and fraudulently promised that it would not invoke the provision." Id. Additionally, the SJC noted that the contract in Turner "was fully negotiated," whereas "the termination provision in the [McEvoy] contract was not mentioned during negotiations but rather had been inserted unilaterally by [the defendant]." Id. at 194. Thus, according to the SJC, "[t]he jury reasonably could have concluded that it was [the plaintiff's] acceptance of [the defendant's] fraudulent assurances that constituted their agreement on the issue, and not the contradictory written provision in the contract." Id. at 193-94.

In the court's view, the facts of this case more closely align with McEvoy than they do with Turner. For one, there is no indication that the parties ever negotiated any of the terms of the March 2011 notes, let alone those relating to the enforceability of the notes themselves. Thus, there is no

indication that the enforcement provisions were "fully negotiated" or that the alleged misrepresentations occurred during the course of the negotiations.  As noted, this is one of the primary ways in which the SJC differentiated the facts in McEvoy from those in Turner.

Additionally, there are facts in the record from which a jury could reasonably conclude that Joyal fraudulently induced Daviduk to enter into *both* the March 2011 promissory notes and the March 15, 2011 sale of the Dunkin' Donuts franchise. Daviduk alleges in her affidavit — which must be credited at this stage — that Joyal specifically stated on or around March 15, 2011, that the money provided in the March 2011 notes was to help "make things right" and that Daviduk would only need to make a payment or two under the promissory notes for tax purposes.  Based on these facts, a jury could reasonably conclude that Joyal, in order to induce Daviduk to both sign the March 2011 notes and to close on the sale of the franchise, pointed to a particular provision in the notes — the enforcement language — and fraudulently promised that he would not invoke that provision.  These are the precise circumstances present in McEvoy, circumstances the SJC specifically noted were absent in Turner.

Each of Joyal's arguments to the contrary is unavailing. In his motion, Joyal argues that Daviduk cannot use prior or

contemporaneous conversations to avoid payment on the notes
because they are barred by parol evidence rule.  This argument
fails, as it is "well-established in Massachusetts that the
parol evidence rule does not apply when the complaining party
alleges fraud in the inducement."  Indigo Am., Inc. v. Big
Impressions, LLC, 597 F.3d 1, 5 (1st Cir. 2010) (brackets,
internal quotations, and citations omitted).

Relatedly, Joyal argues that any prior statements are
irrelevant as a matter of law because the promissory notes were
fully integrated agreements.  "An integration clause in a
contract does not insulate automatically a party from liability
where he induced another person to enter into a contract by
misrepresentation."  Starr, 648 N.E.2d at 1268 (citation
omitted).  And, as noted, there is no evidence that the parties
actually negotiated the terms of the March 2011 notes.  Thus, a
jury could reasonably conclude here, as in McEvoy, that it was
Daviduk's acceptance of Joyal's fraudulent assurances, and not
the contrary language in the contract, that constituted their
agreement on the issue of enforceability.

At the hearing, Joyal's counsel argued for the first time
that it was unreasonable for Daviduk to rely on Joyal's
statements because Daviduk was represented by counsel at the
time the promissory notes were executed.  Joyal did not raise
this argument in his motion or reply, and has not pointed the

court to any authority in support of this proposition. The court's own research has revealed none. The SJC has, however, stated that a plaintiff's sophistication does not relieve a defendant of his obligation to deal with the plaintiff in an honest manner. See, e.g., Starr, 648 N.E.2d at 1268. The court therefore declines to rule now, as a matter of law, that Daviduk's reliance on Joyal's statements was unreasonable simply because she was represented at the time the statements were made.

In his supplemental memorandum,[5] Joyal argues that this case should be governed by Turner and not McEvoy. He relies, as he did in his motion, on the HSBC Realty Credit Corporation (USA) v. O'Neill, 745 F.3d 564 (2014) ("HSBC").

In HSBC, the First Circuit addressed both McEvoy and Turner and elected to follow the latter. See 745 F.3d at 570–74. The SJC conducted a similar analysis in the case Masingill v. EMC Corporation. See 870 N.E.2d at 88–90. Both of these cases differentiated McEvoy on its facts, see HSBC, 745 F.3d at 573; Masingill, 870 N.E.2d at 89, and both can reasonably be read to suggest that McEvoy stands as a limited exception to the general

---

[5] At the hearing, the court directed the parties to provide additional briefing on the applicability of two cases that the parties did not address in their initial filings. One of these cases was McEvoy.

20

rule announced in Turner.  The court declines, however, to read either case as limiting McEvoy *solely* to the unique circumstances presented in that case.  Indeed, both the First Circuit and the SJC ultimately relied upon the same fundamental difference between those cases and McEvoy: that the alleged misrepresentations occurred during negotiations and were not, as they were in McEvoy, specific fraudulent statements that a provision or provisions of the written contract would not be enforced.  HSBC, 745 F.3d at 573; Masingill, 870 N.E.2d at 89–90.  As discussed above, the facts in the record here, when viewed in the light most favorable to Daviduk, fall on the McEvoy side of this dichotomy.  The court cannot read HSBC or Masingill as compelling a different conclusion as a matter of law.

In sum, there is a triable issue as to whether Joyal fraudulently induced Daviduk to execute the March 2011 notes. Joyal is accordingly not entitled to summary judgment as to those notes.  The court emphasizes, however, that it reaches this conclusion without making any determination as to Daviduk's credibility.  Such determinations are beyond the scope of the court's review at the summary judgment stage, and are left for the jury at trial.  See, e.g., Hicks v. Johnson, 755 F.3d 738, 743 (1st Cir. 2014) (when determining whether summary judgment is appropriate, a court "may neither evaluate the credibility of

witnesses nor weigh the evidence").

In sum, Joyal's motion for summary judgment is denied as to the March 2011 notes.

**III. Damages**

Finally, the court will briefly touch upon damages.  Joyal contends that he is entitled to damages including, among other things, the outstanding principal and interest under the notes. In her objection, Daviduk argues that even if Joyal ultimately prevails in this action, the amount of interest owed under the notes is unclear because the interest provisions are ambiguous. The court agrees.

As mentioned above, each note contains two provisions concerning interest.  The first states that "[t]he principal balance outstanding from time to time hereunder shall bear interest at a rate equal to TEN PERCENT (10%), compounded annually."  See, e.g., doc. no. 15-2.  The second states that "[c]ommencing five (5) business days after notice of demand is received by Maker, this Note shall bear interest at the annual rate of TEN PERCENT (10%), from such date until paid."  See, e.g., id.  While both of these provisions contemplate the same interest rate, they appear to differ as to when interest will begin to accrue: the first may be fairly read to suggest that interest will begin accruing at the time of execution, whereas the second expressly contemplates interest beginning to accrue

five days after notice of demand is received by Daviduk.
Depending on the date Joyal demanded repayment under the notes,
this difference could have a significant impact on the damages
to which Joyal would be entitled in this case.  As the parties
have not briefed this issue, and Joyal is not entitled to
summary judgment on all four notes, the court leaves it for
another day

## Conclusion

In sum, Joyal's motion for summary judgment (Doc. no. 15)
is granted in part and denied in part.  The motion is granted as
to Daviduk's counterclaims and Joyal's claim as it relates to
Daviduk's liability under the November 2010 notes.  It is denied
as to Joyal's claim as it relates to Daviduk's liability under
the March 2011 notes and as to Joyal's entitlement to damages
under any of the notes.

SO ORDERED.


_____
Andrea K. Johnstone
United States Magistrate Judge



June 30, 2017

cc:   John Daniel Prendergast, Esq.
      Steven J. Bolotin, Esq.
      Ralph Suozzo, Esq.
      Anthony S. Augeri, Esq.